Andrew M. Calamari
Sanjay Wadhwa
Charles D. Riely
Dominick D. Barbieri
New York Regional Office
SECURITIES AND EXCHANGE COMMISSION
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-0124 (Barbieri)
Attorneys for Plaintiff



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

-against-

ZACHARY ZWERKO

    Defendant.

14-CV-____ (____)

COMPLAINT

---

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against defendant Zachary Zwerko ("Zwerko") alleges as follows:

## SUMMARY

1. This case involves an insider trading scheme carried out by Zwerko. Zwerko had access to confidential acquisition planning information of a major pharmaceutical company ("Pharma Co.") through his employment as a financial analyst at Pharma Co. Zwerko misappropriated this information and repeatedly tipped a friend, who is a former business school classmate (the "Trader"), who used this information to

make profitable trades in advance of at least two acquisitions.

2. Through his work, Zwerko obtained confidential information concerning the (i) nonpublic negotiations between Pharma Co. and Idenix Pharmaceuticals, Inc. ("Idenix") that resulted in a June 9, 2014 pre-market open announcement that Pharma Co. had agreed to acquire Idenix for $24.50 per share (the "Idenix Announcement"); and (ii) nonpublic negotiations between Ardea Biosciences, Inc. ("Ardea") and several pharmaceutical companies, including Pharma Co., participating in a competitive bidding process that resulted in a April 23, 2012 pre-market open announcement that AstraZeneca PLC ("AstraZeneca") had agreed to acquire Ardea for $32 per share in cash (the "Ardea Announcement").

3. In both instances, Zwerko misappropriated the material nonpublic information he obtained from Pharma Co. in breach of the duty of confidentiality he owed it and tipped the Trader. After receiving this information, the Trader traded prior to the public announcements of the acquisitions and made over $683,000 of illicit profits.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

4. The Commission brings this action pursuant to the authority conferred upon it by Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)]. The Commission seeks a permanent injunction against Zwerko, enjoining him from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, and disgorgement of all profits realized or other ill-gotten gains from the unlawful insider trading activity set forth in this Complaint, together with prejudgment interest. The Commission also seeks civil penalties against Zwerko pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]. Finally, the

Commission seeks any other relief the Court may deem appropriate pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), 21A and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1 and 78aa].

6. Venue lies in this Court pursuant to Sections 21(d), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u-1 and 78aa]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the Southern District of New York and elsewhere and were effected, directly or indirectly, by making use of the means or instrumentalities of transportation or communication in interstate commerce, or of the mails, or the facilities of a national securities exchange. During the time of the conduct at issue, shares of Idenix and Ardea were traded on the Nasdaq market, an electronic stock market located in the Southern District of New York. In addition, many of the communications in furtherance of the insider trading alleged in this Complaint were made from, to, or within the Southern District of New York and the Trader placed some illegal trades from his office in the Southern District of New York.

## THE DEFENDANT

7. **Zwerko**, age 32, is a resident of Cambridge, Massachusetts. Zwerko was employed as a senior financial analyst at Pharma Co. until July 2014 when he left Pharma Co. for a business development position with another company.

## RELEVANT ENTITIES

8. **Idenix** is headquartered in Cambridge, Massachusetts and was recently acquired by Pharma Co. Until Pharma Co. acquired Idenix, Idenix's common stock was

3

registered with the Commission pursuant to Section 12(b) of the Exchange Act and was listed on the NASDAQ stock market under the symbol "IDIX."

9. **Ardea** is a wholly-owned subsidiary of AstraZeneca, and is headquartered in San Diego, California. Until AstraZeneca acquired Ardea, Ardea's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and was listed on the NASDAQ stock market under the symbol "RDEA."

## FACTS

### Zwerko's Friendship with the Trader

10. Zwerko and the Trader first met in approximately 2008 when they were business school classmates. Following business school, the two maintained a social relationship. For example, Zwerko attended at least one of the Trader's annual Halloween parties, and they have gone skiing together. As recently as July 2014, the Trader invited Zwerko to visit the Trader's new home in New Jersey.

### Zwerko's Access to Pharma Co.'s Confidential Information and His Obligation to Maintain Confidentiality

11. Zwerko had access to material nonpublic information as a regular part of his role at Pharma Co. As a senior financial analyst with Pharma Co.'s Financial Evaluation and Analysis group (" Pharma Co. Finance"), Zwerko was responsible for conducting analysis in support of business combination and divestiture opportunities.

12. In that capacity, Zwerko had access to a shared drive that contained project folders concerning potential transactions. Each folder represented a separate project that Pharma Co. Finance was considering in support of Pharma Co.'s business development, including potential acquisitions and joint ventures. Zwerko was responsible both for conducting preliminary due diligence (which involved primarily a

review of public information) and advanced due diligence (which involved, among other things, financial modelling after a confidentiality agreement had been signed and access granted to a target's internal documents).

13. Pharma Co. considered information relating to its potential business combinations highly confidential, and put in place policies designed to protect this information. Among other things, Pharma Co. created project names to protect the confidentiality of the transaction. For example, Pharma Co. referred to its impending acquisition of Idenix as "Project Invincible."

14. Under Pharma Co.'s policies and his employment contract, Zwerko was obligated to maintain the confidentiality of Pharma Co.'s business information and was forbidden to pass that information on to those without a business need to know. These policies specifically prohibited Zwerko from disclosing material nonpublic information concerning Pharma Co. or its acquisition planning.

15. As detailed below, despite his owing a duty of confidentiality to Pharma Co., Zwerko tipped the Trader in advance of at least two acquisitions.

### Zwerko's Illegal Tips to the Trader and the Trader's Illicit Trading Ahead of the Idenix Announcement

16. The Trader traded in advance of the Monday, June 9, 2014, pre-market open announcement that Pharma Co. had agreed to acquire Idenix for $24.50 per share. He traded these securities on the basis of confidential information tipped to him by Zwerko in breach of Zwerko's obligations to Pharma Co.

17. From at least April 2014, Pharma Co. and Idenix undertook nonpublic, confidential discussions relating to a potential business combination. On May 13, 2014,

the two companies executed a confidentiality agreement and a standstill agreement.[1] From April 1, 2014 until the Idenix Announcement, Idenix traded at a price range between $5.05 and $7.23 per share. After the Idenix Announcement, Idenix's stock rose from $7.23 (the closing price on Friday, June 6) to $23.79 (the closing price on June 9), an increase of over 238 percent.

18.  Zwerko accessed confidential information relating to Pharma Co.'s merger negotiations with Idenix. Although Zwerko did not perform work for Pharma Co. related to Idenix and was not assigned to Pharma Co.'s deal team, Zwerko received an email from his supervisor that referenced the impending acquisition and also accessed computer files, including detailed presentations, relating to the details of the acquisition and/or confidential information supplied by Idenix to Pharma Co.

19.  By at least May 5, 2014, Zwerko began accessing confidential information relating to Pharma Co.'s potential business combination with Idenix and/or confidential information supplied by Idenix to Pharma Co. On May 5, 2014, at 1:51 p.m. and 1:52 p.m., Zwerko accessed confidential presentations that related to Idenix's business that Idenix had provided as part of nonpublic negotiations with Pharma Co.

20.  Both of the documents Zwerko accessed were stored in a Pharma Co. Finance shared drive that contained Pharma Co.'s confidential list of potential business combinations and divestitures. The files Zwerko accessed came from one folder within the shared drive relating to the nonpublic negotiations with Idenix, titled "Invincible".

21.  Zwerko, who had accessed files that referenced a potential business

---

[1] A standstill agreement typically requires a suitor company to refrain from increasing its position in a potential target in return for a promise by the target to buy back the suitor's shares at a premium.

6

combination between Pharma Co. and Idenix from the Project Invincible folder, knew, or was reckless in not knowing, that "Invincible" was the code name assigned to possible business combinations with Idenix.

22. A few weeks later, on May 20, 2014, at 4:08 p.m., Zwerko's supervisor forwarded to Zwerko and others an email that included confidential and nonpublic information concerning Idenix. Although the forwarded email focused on the discount rates to be used for financial modelling, the email chain included several emails relating to Project Invincible.

23. One email chain included a reference to the fact that Pharma Co. had made a nonbinding offer for Invincible eleven days earlier on May 9. Other emails in the chain indicated that Pharma Co. was in the process of executing advanced due diligence and financial modelling on Project Invincible.

24. Minutes after receiving the May 20th email from his supervisor relating to Project Invincible, at 4:17 p.m., Zwerko accessed Yahoo Finance's summary page for Idenix from his work computer. Later, at 4:28 p.m., he accessed headlines relating to Idenix on Yahoo Finance. These site visits were the first time that Zwerko had accessed internet information relating to Idenix from his work computer since at least January 2012.

25. Later on the evening of May 20, at 8:11 p.m., 8:30 p.m., and 8:31 p.m., Zwerko accessed three separate files from Pharma Co.'s Project Invincible folder relating to an analysis of Idenix and/or Idenix's confidential information.

26. Zwerko had timely communications with the Trader after accessing Pharma Co.'s confidential information relating to its planned acquisition of Idenix. On

the evening of May 20, 2014, after receiving the email from his supervisor that referenced the offer to Idenix, Zwerko sent a text to the Trader at 5:38 p.m. Later that evening, at 8:44 p.m., minutes after accessing confidential files relating to Idenix, Zwerko placed a call to the Trader, which lasted approximately 12 minutes.

27. Just two minutes after the Trader's call with Zwerko ended on May 20, at 8:58 p.m., the Trader placed an order to buy 1,000 shares of Idenix at a limit order of $5 from his home in New Jersey.

28. Although that limit order was not executed, the Trader purchased a substantial position in Idenix over the next several days. Specifically, between May 21, 2014, and June 6, 2014, the Trader purchased 33,000 shares at prices between approximately $6.25-7.25 per share. In total, the Trader spent over $219,000 on Idenix securities. Some of the Trader's purchases were on margin. The Trader's Idenix position was the second largest in his portfolio, after his position in Ardea.

29. The Trader continued to trade after timely communications with Zwerko. For example, on May 21, 2014, Zwerko accessed a confidential file that contained detailed information about Pharma Co.'s intent to submit a revised acquisition offer and indicated that the acquisition would be reviewed by Pharma Co.'s board on May 27, 2014. Subsequently, Zwerko attempted to delete this file from his computer. In addition, on June 3, 2014, at 12:57 p.m., Zwerko accessed a file that referenced the first name of Pharma Co.'s CEO. That day, a group of Pharma Co. employees met with Pharma Co.'s CEO to update him on the status of negotiations with Idenix and to discuss a revised bid to acquire Idenix.

30. A few hours after accessing the file containing an apparent update to

8

Pharma Co.'s CEO, at 5:31 p.m. on June 3, Zwerko called the Trader, and the call lasted three minutes. The Trader then made additional purchases on June 4, June 5, and June 6.

31. After the Idenix Announcement, the Trader sold his Idenix securities for a profit of approximately $579,000.

32. The Trader's trades in Idenix were unusual for several reasons: (i) he had not purchased Idenix securities before May 21, 2014; (ii) a portion of the Trader's holdings was acquired on margin, and these were the first margin purchases made by the Trader since at least October 2013; and (iii) the substantial amount of money (over $219,000) that the Trader spent buying Idenix securities was the most he had invested in a single security since his 2012 purchases of Ardea stock (discussed below).

**Zwerko's Illegal Tips to the Trader and the Trader's Illicit Trading Ahead of the Ardea Announcement**

33. The Trader also traded in advance of the Monday, April 23, 2012, pre-market open announcement that Ardea had agreed to be acquired by AstraZeneca for $32 per share in cash. In the months preceding the Ardea Announcement, Ardea had engaged in a series of confidential discussions with several companies, including Pharma Co., concerning possible acquisitions. During these nonpublic negotiations, Ardea traded at a price between $19.65 and $22.94. After the Ardea Announcement, Ardea's shares rose from $20.84 (the close on Friday, April 20) to $31.62 (the close on Monday, April 23), an increase of over 51 percent.

34. Zwerko obtained material nonpublic information concerning Pharma Co.'s confidential, nonpublic merger discussions because he helped Pharma Co. evaluate making its own bid to acquire Ardea. On February 17, 2012, Ardea's banker sought indications of interest from twelve companies that had previously signed confidentiality

9

agreements, including Pharma Co. Pharma Co. then engaged in confidential negotiations with Ardea. Through his role at Pharma Co. Finance, Zwerko performed work relating to these nonpublic negotiations.

35. Zwerko was involved in Pharma Co.'s planning and/or acquisition analysis relating to Ardea and had access to confidential and nonpublic information about Pharma Co.'s M&A objectives and planned offers concerning Ardea, which was known internally as Project Quartz. For example, on February 12, 2012, Zwerko attended a Pharma Co. Finance meeting to discuss the term sheet and deal structure for Quartz. And, on February 27, 2012, at 2:30 p.m., Zwerko attended a meeting scheduled for half an hour under the subject of "Team request to proceed to non-binding bid on Quartz." Zwerko conducted financial analysis in support of Pharma Co.'s bid and accessed confidential documents provided by Ardea to Pharma Co. in connection with merger discussions.

36. Although Pharma Co. did not ultimately acquire Ardea, it participated in the negotiations until at least a week before the Ardea Announcement and made a nonpublic offer to acquire Ardea for $30.25 per share on April 17, 2012.

37. Zwerko had timely communications with the Trader after accessing Pharma Co.'s confidential information concerning its acquisition planning relating to Ardea. On Friday, February 24, 2012, while Zwerko was performing work in connection with Ardea, Zwerko and the Trader exchanged two calls that lasted a total of 18 minutes. On Monday, February 27, 2012, at 4:08 p.m., just hours after attending the internal meeting relating to Pharma Co.'s intent to make a non-binding offer to Ardea, Zwerko placed a call to the Trader's cell phone, which lasted for six minutes. Starting the next

day, February 28, 2012, the Trader began purchasing Ardea securities. Between February 28, 2012 and April 18, 2012, the Trader purchased a total of 9,800 shares of Ardea through three brokerage accounts. In total, the Trader purchased over $227,000 worth of Ardea securities.

38. After the Ardea Announcement, the Trader sold all his shares and reaped profits of approximately $105,000. The Trader's purchases in Ardea were unusual in that he had not previously purchased Ardea's securities and executed his first purchase the day after Zwerko attended a Pharma Co. meeting requesting permission to bid on Ardea, following which meeting Zwerko called the Trader. Moreover, the over $227,000 that the Trader spent on acquiring Ardea securities was the most that the Trader had ever invested in a single issuer. Finally, a portion of the Trader's positions was acquired on margin.

## CLAIMS FOR RELIEF

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

39. The Commission realleges and incorporates by reference paragraphs 1 through 38, as though fully set forth herein.

40. The information that Zwerko obtained concerning Pharma Co.'s acquisition interest in, and analysis of, Idenix and Ardea was material and nonpublic.

41. Pharma Co. treated the information as confidential, including through policies and procedures designed to protect such information and to prohibit its employees from tipping such information.

42. Zwerko knew or recklessly disregarded that the information was material and nonpublic.

43. Zwerko knew or recklessly disregarded that he owed a fiduciary duty, or an obligation arising from a similar relationship of trust and confidence, to Pharma Co., and/or its shareholders to keep the information confidential.

44. Yet Zwerko tipped his friend the Trader to trade in the securities of Idenix and Ardea, on the basis of the material nonpublic information Zwerko obtained and/or misappropriated from Pharma Co. He did so for a personal benefit. By doing so, Zwerko breached his fiduciary duty, or other obligation arising from a similar relationship of trust and confidence, to Pharma Co. and/or its shareholders.

45. The Trader knew or recklessly disregarded that the material nonpublic information was disclosed in breach of a fiduciary duty, or an obligation arising from a similar relationship of trust and confidence.

46. The Trader traded on the basis of the material nonpublic information that Zwerko tipped him by purchasing Idenix and Ardea's securities.

47. By virtue of the foregoing, Zwerko, in connection with the purchase or sale of securities, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, directly or indirectly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon persons.

48. By reason of the conduct described in this Complaint, Zwerko, directly or indirectly, violated, and, unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## RELIEF SOUGHT

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

### I.

Permanently restraining and enjoining defendant Zwerko, his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### II.

Ordering defendant Zwerko to disgorge, with prejudgment interest, all illicit trading profits, or other ill-gotten gains received as a result of the conduct alleged in this Complaint;

### III.

Ordering defendant Zwerko to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; and

## IV.

Granting such other and further relief as this Court may deem just and proper.

Dated: New York, New York
October 10, 2014

*Sanjay Wadhwa*
Sanjay Wadhwa
Andrew M. Calamari
Charles D. Riely
Dominick D. Barbieri
New York Regional Office
SECURITIES AND EXCHANGE
COMMISSION
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-0124 (Barbieri)
Attorneys for Plaintiff